Vanessa DIXON, Plaintiff, Appellee/Cross– Appellant,

v.

INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS; International Brotherhood Of Police Officers, Local 382; John Leary, Defendants, Appellants/Cross–Appellees,

Kenneth T. Lyons, Defendant, Cross–Appellee.

Nos. 06–1210, 06–1211, 06–1212, 06–1851, 06–1852, 06–1918, 06–2094.

United States Court of Appeals, First Circuit.

Heard June 5, 2007.

Decided Sept. 28, 2007.

Joseph W. Monahan, III, with whom Thomas G. Freda and Monahan & Padellaro were on brief, for appellants and cross-appellees.

Inga S. Bernstein, with whom Monica Pastorok, Rachel Stroup, and Zalkind, Rodriguez, Lunt & Duncan LLP were on brief, for appellee/cross-appellant.

Before LYNCH, LIPEZ, and HOWARD, Circuit Judges.

LYNCH, Circuit Judge.

This appeal stems from an ugly incident of verbal abuse of a female police officer by her fellow male officers during a union-sponsored bus trip in the fall of 1998, as well as from the actions of the union and its members in response to the investigations of her complaints in the years that followed. The female officer, Vanessa Dixon, eventually brought a civil suit in federal court against the national union and its local chapter, their presidents, and two of the police officers involved in the incident, asserting claims of discrimination, retaliation, and defamation. The jury found for Dixon on some but not all of her claims, awarding her a total of $1,205,000 in compensatory damages and $1,027,501 in punitive damages.

Defendants appeal the judge's denial of their motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), as well as the judge's jury instructions regarding retaliation and punitive damages. Dixon, who lost her defamation

claim against the national union and its president, appeals the judge's determination that she was a public official, which required the jury to find that the defendants acted with actual malice. We affirm.

## I. BACKGROUND

Because some of the defendants challenge the denial of their motions for judgment as a matter of law, we recount the facts in the light most favorable to the verdict. *Muñiz–Olivari v. Stiefel Labs., Inc.*, 496 F.3d 29, 35–36 (1st Cir.2007). Vanessa Dixon joined the Lowell Police Department in 1994, when there were fewer than ten female police officers in a force of nearly three hundred. She was twenty-three years old. After early assignments with neighborhood-based community policing programs, Dixon was assigned full-time as a resource officer at Rogers Middle School, an inner-city school. In that position, she coordinated with Social Services and Juvenile Probation to assist troubled students and their families. Among other duties, she conducted peer mediation, organized after-school and summer activities, taught gang resistance and a "teens against violence" curriculum, and advocated for students who were having trouble at home. This work required Dixon to develop relationships of trust and respect with the students and within the community. Her early evaluations were extremely positive, and she received special awards from her unit for her work with young people.

The day Dixon joined the police department, she automatically joined the police officers' union, Local 382 ("Local") of the International Brotherhood of Police Officers ("IBPO"). An active member, Dixon ran for the Local's executive board, hosted holiday parties for members' families, participated in fundraising events, and traveled with the Local to union events in Puerto Rico and Washington, D.C. In the fall of 1998, Dixon agreed to participate with the Local in a gubernatorial campaign rally in Boston.

On October 26, 1998, Dixon joined seven of her fellow officers and six corrections officers on a hired bus to travel to Boston. She was the only woman on the trip, other than the bus driver. From the moment she walked into the union hall that afternoon, she was subjected to gender-based criticisms by the other officers regarding what she was wearing and her presence on an all-male trip. Once in Boston, the group participated briefly in the rally at Faneuil Hall, then reboarded their bus for Anthony's Pier 4, where the IBPO hosted a dinner and open bar. After dinner, the group moved to the restaurant's bar, where they befriended a group in town for a convention. Gerald Flynn, the president of the Local and the organizer of the Boston trip, invited these out-of-towners to join the Lowell group on their bus as they continued on to J.J. Foley's, a bar in the South End frequented by police officers.

Dixon spent time at J.J. Foley's with some of the conventioneers, including a man named Jason Kumm. When the bar closed at 2 a.m., Kumm did not know how to get back to his hotel, so Dixon persuaded the bus driver to drop Kumm off before heading back to Lowell.

As the bus left the bar, John Leary—a police officer whom Dixon had once dated and who was sitting directly across the aisle from her—started yelling at Dixon for creating a delay-causing detour so late at night. The shouting escalated as other people at the back of the bus joined in. The comments, directed at Dixon and Kumm, turned sexual: "Why don't you fuck her. We all have." "She gives great blowjobs." "She will do you, she's done all of us." The bus driver, who testified that she had spent seven years trying to forget

that night, explained that "the word fuck was used so often that I was turning my mind off to it." Kumm described the barrage as "totally inappropriate conversation, verbally abusive, threatening." Flynn, sitting at the front of the bus, encouraged Kumm to get off before a fight broke out; the situation, he thought, "had the potential to explode."

Kumm did get off the bus before it reached his hotel, but the verbal abuse of Dixon did not end. Leary kept shouting in Dixon's face such comments as, "Get off the bus with your boyfriend. Go fuck him at the Sheraton if you want to bring him with you." Similar comments continued from the back of the bus. When Dixon looked behind her, she saw another officer, David Pender, standing with his hands down his pants and saying, "Why don't you come and fucking blow me."[1] Terrified, Dixon demanded the bus driver let her off the bus near Boston Common, even though the driver and Ed McMahon, another officer, tried to dissuade her. Throughout all of this, Flynn remained at the front of the bus; although the president of the Local, he did not intervene to stop the abuse or to try to reassure Dixon when she wanted to flee.

During her efforts to make her way home, Dixon was subjected to an attempted sexual assault by a stranger. Distraught, Dixon called in sick to work the next two days, and when she did return to work, she avoided speaking about the bus incident. A few weeks later, however, the Chief of the Lowell Police Department, Edward Davis III, caught wind of the incident and started an internal investigation, in which Dixon cooperated. On November 19, 1998, the Chief sent letters to the male officers on the bus trip, including Leary, ordering them to have no contact with Dixon.

On November 20, the very next day, Leary sought and received an ex parte temporary restraining order ("TRO") against Dixon under chapter 209A of the Massachusetts General Laws. Leary's cursory affidavit, which the jury did not see, evidently alleged that Dixon had made threatening comments to him the evening of the bus incident. He did not explain why he had waited a month to seek protection from Dixon in the form of a TRO. Leary knew the TRO would have the result, under department policy and Massachusetts law, of forcing the police department to put Dixon on administrative leave and confiscate her weapon while the TRO was in effect. Although Dixon hired a lawyer and went to court to deny the allegations, Leary never returned to court to support his TRO or seek continued protection, allowing the TRO to expire after its initial fifteen-day coverage. Dixon testified she was humiliated when she had to explain her month-long absence, caused by the TRO, to the teachers, students, and parents with whom she worked at Rogers Middle School. Because of the TRO, she had to get special permission to renew her firearms permit, and she avoided participating in outreach programs that required a background check.

The *Lowell Sun* reported that Leary had obtained a TRO against Dixon. This marked the beginning of extensive local publicity about the bus incident and its aftermath. Flynn was quoted frequently in the paper and appeared on local television stations and radio shows talking about his version of events. The president of the IBPO, Kenneth Lyons, hosted a local television show produced and paid for by the union; he used this show over the follow-

---

1. This fact was much disputed at trial, and the jury did not find Pender liable on any count. We include it here, however, as a jury could find it relevant in holding Flynn and the Local liable for discrimination based on Dixon's overall experience on the bus.

ing year to defend the male officers and disparage Dixon, the police chief, and the city manager for pursuing their investigation. His comments grew increasingly vicious and were the basis for Dixon's defamation claim against Lyons and the IBPO, as well as part of the basis for her retaliation claims.

At the conclusion of the internal investigation in the spring of 1999, the city fired Leary and suspended Flynn, Pender, and some of the other officers. The officers appealed to the Civil Service Commission, which held additional hearings that fall. In the interim, Jose Rivera, one of the disciplined officers, filed an internal sexual harassment claim against Dixon. So did another officer who co-taught DARE summer camps with Dixon, further disrupting her work at the school. Both claims were later determined to be unfounded.

In January 2000, the Civil Service Commission dismissed the charges against Flynn[2] and a few of the other officers, finding insufficient evidence to sustain the charges against them. It also determined that Dixon's testimony regarding Pender's alleged indecent exposure, Flynn's allegedly inappropriate comments to the bus driver, and various other details of events the night of the bus incident was inconsistent and thus not credible. The Commission's final decision, issued in January 2001, sustained Leary's termination, though it decreased the length of Pender's and Rivera's suspensions. It again concluded that Dixon's testimony was not entirely truthful. Within a month, Leary, Pender, and Rivera all filed complaints against Dixon with the police department's internal affairs office, accusing her of perjury and launching another internal investigation.

This investigation concluded in the spring of 2002 that Dixon had perjured herself in statements made to the department's investigators and in testimony before the Civil Service Commission, and the city sent Dixon a notice of contemplated discipline in August 2002. She had, however, already quit the force on June 12, 2002.

Dixon first filed complaints with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") in the spring of 1999. After receiving "Right to Sue" letters from both the MCAD and the EEOC, Dixon brought suit in October 2001 in the District of Massachusetts against Leary, Flynn, Pender, Lyons,[3] Local 382, and the IBPO, alleging discrimination and retaliation under both state and federal statutes, as well as assault, intentional infliction of emotional distress, and defamation. After an eleven-day jury trial in the fall of 2005, the jury found against Leary on the intentional infliction of emotional distress claim. It also found for Dixon and against Flynn and the Local on the discrimination claims and against Leary and the IBPO on the retaliation claims. Dixon lost her assault and defamation claims. In addition to compensatory damage awards totaling $1,205,000, the jury awarded punitive damages of $25,000 against the Local and $1 against Flynn for discrimination, and $1,000,000 against the IBPO and $2,500 against Leary for retaliation. These appeals followed.

## II. DEFENDANTS' APPEALS

### A. Denial of Rule 50(b) Motions

■ We review de novo the district court's denial of the defendants' Rule 50(b)

---

**2.** Flynn, who at the time of the bus incident had been an alternate vice president for the IBPO as well as president of Local 382, had left the Lowell police force in November 1999 to work full time as national vice president at

the National Association of Government Employees, of which the IBPO is a division.

**3.** Lyons died in August 2006.

motions for judgment as a matter of law. The moving party bears a heavy burden: we will set aside the jury verdict only if "the evidence, viewed in the light most favorable to [Dixon], points so strongly and overwhelmingly in favor of [the defendants], that a reasonable person could not have arrived at [this] verdict." *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 188 (1st Cir.1996); *see also, e.g., Valentín-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 95–96 (1st Cir.2006).

Defendants Leary and the IBPO challenge the sufficiency of the evidence for the jury's findings of retaliation, and the Local challenges the sufficiency of the evidence for holding it liable for discrimination. In all three instances, there was sufficient evidence for the jury to reach the conclusions it did.

### 1. *Retaliation Claims*

Dixon brought her retaliation claims under both federal and state law, and the jury's findings of retaliation do not differentiate between them. Title VII forbids any "employer to discriminate against any of his employees ... [or any] labor organization to discriminate against any member thereof ... because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Under the Massachusetts employment discrimination statute, no "person, employer, [or] labor organization" may "discharge, expel or otherwise discriminate against any person ... because [she] has filed a complaint, testified or assisted in any proceeding" covered by the

statute. Mass. Gen. Laws ch. 151B, § 4(4). Further, no "person [may] coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected" by the antidiscrimination statute. *Id.* § 4(4A).

▮ All three provisions require Dixon to provide evidence that (1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity. *McDonough v. City of Quincy*, 452 F.3d 8, 17 (1st Cir. 2006); *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 338 (2004).[4] But what constitutes an "adverse action" differs slightly under each provision. For Title VII's retaliation provision, the adverse action must be one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," whether or not the harm occurs in the workplace. *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. ——, 126 S.Ct. 2405, 2409, 165 L.Ed.2d 345 (2006). As it has been interpreted to date by state courts, section 4(4) of the Massachusetts statute requires evidence that Dixon suffered an "adverse employment action"; under section 4(4A), the adverse action is any action "to coerce, intimidate, threaten, or interfere with" the plaintiff. *Mole*, 814 N.E.2d at 338–39 & n. 14; *Ritchie v. Dept. of State Police*, 60 Mass.App.Ct. 655, 805 N.E.2d 54, 62 & n. 16 (2004).

▮ Both Leary and the IBPO argue that Dixon failed to establish her claims of retaliation because she did not offer evidence that she suffered an adverse action

---

**4.** This is the prima facie test under the *McDonnell Douglas* burden-shifting framework as applied to claims brought under both the federal and state retaliation provisions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McDonough,* 452 F.3d at 17 (Title VII retaliation claim); *Mole v. Univ. of Mass.,* 442 Mass. 582, 814 N.E.2d 329, 338 (2004) (retaliation claim under sections 4(4) and 4(4A) of the Massachusetts statute).

pertaining to her union membership as opposed to her employment.[5] The argument is incorrect: both Title VII and the Massachusetts antidiscrimination statute cover retaliation claims against unions which cause harm in the workplace and outside of it.

 While *Burlington Northern* and *Mole* articulated the test for retaliation by an employer, we apply that test to Dixon's claim of retaliation by the union. This follows logically from the language of both the state and federal statutes. As explained in *Burlington Northern,* the language of Title VII's retaliation provision, unlike the discrimination provision, is not limited to workplace conditions; it simply prohibits employers—and unions—from discriminating broadly against employees or union members in retaliation for their pursuit of discrimination claims. 126 S.Ct. at 2412. If an "employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace," *id.,* then it follows that a union can effectively retaliate against a member in any context, including *within* the workplace. *Cf. Thorn v. Amalgamated Transit Union,* 305 F.3d 826, 830–31 (8th Cir.2002) (holding, prior to *Burlington Northern,* that any adverse action is sufficient to establish a retaliation claim against a union, including but not limited to adverse employment actions). Section 4(4A) of the Massachusetts statute likewise has no language limiting the coercive, intimidating, threatening, or interfering actions it prohibits to a particular context.

 As for section 4(4), its more specific language—"to discharge, expel or otherwise discriminate against"—includes the catchall phrase "or otherwise discriminate against," which should be read as applying as broadly as the similar language in Title VII's provision. *Cf. Bain v. City of Springfield,* 424 Mass. 758, 678 N.E.2d 155, 160 n. 4 (1997) (Massachusetts courts often look to Title VII law in construing the state antidiscrimination statute). That section 4(4) applies equally to individuals, who can neither discharge nor expel, also argues for a broad construction of the "or otherwise discriminate" clause. Further, the state retaliation provisions are to be construed liberally. Mass. Gen. Laws ch. 151B § 9. If plaintiff has shown the necessary effect on her employment, she need not make a separate showing of an effect on her union membership.[6]

The claims against the IBPO were brought under both state and federal law.[7] The $1,000,000 in punitive damages as-

---

**5.** The IBPO and Leary briefly stated that Dixon also failed to show a causal link between her protected activity and the alleged retaliatory actions, but the defendants failed to develop this argument and have thus waived it. *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). There is no dispute that Dixon engaged in a protected activity by pursuing her sexual harassment claims.

**6.** Even if Dixon *were* required to make a separate showing of an adverse effect on her union membership, the evidence is sufficient to support such a showing here. Once an active union member, Dixon found herself shunned and shut out of her union.

**7.** Both section 4(4) and section 4(4A) of the Massachusetts statute apply to individuals and corporations alike. *See Mass. Elec. Co. v. Mass. Comm'n Against Discrimination,* 375 Mass. 160, 375 N.E.2d 1192, 1204 (1978) (unions are covered by the definition of "person" as used in the antidiscrimination statute) (citing Mass. Gen. Laws ch. 151B, § 1(1)); *Beaupre v. Cliff Smith & Assocs.,* 50 Mass. App.Ct. 480, 738 N.E.2d 753, 764 & n. 16 (2000) (noting that the Massachusetts statute allows for personal liability under both section 4(4) and section 4(4A)).

sessed against the IBPO for retaliation exceeds Title VII's $300,000 statutory cap for punitive and nonpecuniary compensatory damages. 42 U.S.C. § 1981a(b)(3). The Massachusetts employment discrimination statute, however, does not limit punitive damages. Mass. Gen. Laws ch. 151B, § 9; *Dartt v. Browning–Ferris Indus., Inc.*, 427 Mass. 1, 691 N.E.2d 526, 536 (1998). For the full amount of the jury verdict to be sustained, Dixon must have presented sufficient evidence under the state law. Further, the claims against Leary were brought solely under state law.

 Dixon presented enough evidence to establish a claim against Leary under section 4(4) and against the IBPO under section 4(4A) of the Massachusetts statute. Dixon presented evidence that Leary took out the TRO against her the day after he found out he was the subject of an internal police department investigation; that Leary's affidavit requesting the TRO was only a few lines long; that it was based on statements that Dixon claimed she never made; that Leary had not bothered to appear before the court to extend the TRO after the initial fifteen days of its coverage expired; that as a foreseeable result of the TRO, the police department suspended Dixon and confiscated her weapon; and that Dixon had subsequent difficulty on the job as a result of having a TRO on her record. There was clearly sufficient evidence for a jury to determine that Leary retaliated against Dixon by causing her to suffer a materially adverse employment action as required by section 4(4).

Turning to the $2,200,000 compensatory and punitive damages retaliation verdict against the IBPO, the IBPO argues that because the jury found that Dixon had not met her burden of showing that Lyons defamed her, the retaliation claim against the union must be vacated. Specifically, it argues that the comments made by Lyons on his television show cannot be used to prove retaliation. The argument fails for many reasons. The basis for the jury's defamation verdict is unknown. It may have held, on the defamation claim, that the statements were defamatory but that Lyons did not act with the requisite degree of malice. To the extent the union is arguing that this speech cannot support a retaliation claim, the argument is wrong.

In outlawing retaliation, Congress and the Massachusetts legislature prohibited a type of conduct that can, and often does, include speech. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)) (internal quotation marks omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (finding no First Amendment protection, in the context of the National Labor Relations Act, for employer's anti-union comments if those comments constitute "a threat of retaliation based on misrepresentation and coercion").

Courts have often deemed acts by employers and unions that involved speech to be discriminatory or retaliatory. *See, e.g., Eliserio v. United Steelworkers, Local 310*, 398 F.3d 1071, 1077 (8th Cir.2005) (dissemination of "No Rat" stickers by union official found discriminatory); *Hashimoto v.*

*Dalton,* 118 F.3d 671, 674 (9th Cir.1997) (dissemination of unfavorable job reference found retaliatory); *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 572 (8th Cir.1982) (intensive interrogation of employee over filing of EEOC charge found retaliatory). Indeed, the idea that employers can be held liable for speech such as the use of racial or sexual epithets is inseparable from the very purpose of antidiscrimination statutes. *See, e.g., Dowd v. United Steelworkers, Local No. 286,* 253 F.3d 1093, 1101 (8th Cir.2001) (finding racial slurs issued via intercom announcements, derogatory tee shirts, and graffiti directed against black employees who crossed picket line to be discriminatory); *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 155 (3d Cir.1999) (finding that sexist and sexual remarks constituted a hostile work environment).

 There are limits on what speech can be proscribed as retaliatory, but those limits were not violated by the jury verdict. For example, the person or entity accused of discrimination must be allowed to defend himself or itself. *Bain,* 678 N.E.2d at 161 ("What we most emphatically cannot countenance as an instance of retaliation is the mayor's response in the local newspaper to the charges against him . . . . so long as they were not defamatory."). Many of Lyons's comments about Dixon were made after she had filed claims against the IBPO before the MCAD. That does not provide a safe harbor, however, for any and all sort of speech in response. There is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other. The Supreme Judicial Court in *Bain,* for example, upheld a jury verdict under section 4(4A) based on the mayor's order to "get rid of" the plaintiff;

an intermediary in turn had told the plaintiff that the mayor wanted her out of his administration. *Id.* at 157, 160. In the court's view, this statement was "a threat or intimidation" meant to prevent the plaintiff from bringing her claim. *Id.* at 160.

 Lyons did not limit his comments to defending the IBPO or the conduct of its other members. Instead he turned on Dixon, describing her as unfit for her job: "Guess where they have that girl working? And she admits, admits, mind you, to the old four letter word. Course, I wouldn't dare use it. And she, she is working in a school with children. God forbid." He repeatedly insinuated that Dixon would pay a cost for pressing her discrimination claims; for example, he argued that Dixon was the only officer who should be suspended and closed one segment of his show by warning, "that girl who made these fabrications, she's in trouble, she's in trouble, she's in trouble." A jury could reasonably find that such statements, coming from the president of the national union, constituted threats and intimidation that objectively could deter someone in Dixon's position from pressing her claims, or that those statements interfered with Dixon's ability to do so by encouraging her colleagues to stand against her.

### 2. *Discrimination Claims*

The Local concedes that the Boston trip was a union-sponsored event but argues that it cannot be held liable for what occurred on the bus because Flynn and the Local did not supervise or control the officers on the trip. To the contrary, there was sufficient evidence for the jury to find the Local liable.

 The trip was not just union-sponsored; it was organized and executed at every step as a union activity. Lyons, as president of the IBPO, asked Flynn, as president of the Local, to organize a union

contingent to support gubernatorial candidate Paul Cellucci, whom the union had endorsed, at the Boston rally. The trip began and ended at the local union hall. The union paid for the bus, with Flynn himself handing the check to the driver and explaining to her the evening's plans. The driver, in turn, believed Flynn to be in charge and acted on that belief. Flynn used the bus's microphone to give the officers instructions on what they were to do at the rally. He did not use the same microphone to intervene when things got out of hand on the return bus trip. When they arrived at the rally, Flynn coordinated with the IBPO and other local branches, and the officers marched with union banners. The dinner was organized and paid for by the IBPO, and Flynn put rounds of drinks on the Local's credit card. When things got heated that evening, the other officers yelled at Dixon and Kumm that "this is a union trip" and that "[o]nly union members belong on this ... bus." On the trip from Anthony's to J.J. Foley's, Flynn kicked a guest off the bus because he was acting rudely and inappropriately towards the bus driver. He was also aware of how volatile the situation on the bus had become later that evening, encouraging Kumm to get off the bus before a "donnybrook" broke out. It is clear that the police officers were at the rally as representatives of the union and that Flynn was in charge of this union event as president of the Local, and there was also evidence that Flynn could exercise his authority when he chose to do so.

The Local cites *EEOC v. Pipefitters Ass'n Local Union*, 334 F.3d 656 (7th Cir. 2004), for the proposition that unions do not have an affirmative duty to prevent workplace discrimination. *Id.* at 661. Whether or not that proposition is correct is irrelevant here. This is a case of discrimination within the union, by union members (including members of the Lo-

cal's executive board), under the supervision and acquiescence of the Local's president. *See Eliserio*, 398 F.3d at 1076–77 ("A union has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination .... [but] a union may be held liable under Title VII if 'the union *itself* instigated or actively supported the discriminatory acts.'" (citing and quoting *Thorn*, 305 F.3d at 832–33)); *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1201 (9th Cir.1991) (noting that, in interpreting a state statute in light of Title VII, "[w]e see no reason why a union should not be equally liable [compared to employers] for [the union's] acts of ... harassment against its own members"); *see also Dowd*, 253 F.3d at 1103 (finding a union liable under Title VII where "the harassment [in the workplace] was directly connected to a union-sponsored activity" and "at least one union steward participated in the harassment, ... others stood silently by as it occurred, and ... the union's president exhibited discriminatory animus").

The Local seems to argue that the police department's investigation and discipline of the officers suggests that the incident was employment-related, and not union-related, discrimination. If anything, a jury could easily see the union's inaction and failure to investigate in the face of the city's proactive response as increasing the union's liability, not obviating it. *Cf. Woods*, 925 F.2d at 1202 (concluding that the union "effectively ratified the harassment" when it knew of the discrimination but took no action against the offending union representatives).

### B. *Jury Instructions*

Defendants argue that the district judge's jury instructions regarding retaliation and punitive damages were erroneous. Because the defendants did not

raise these objections at trial, we review the instructions for plain error. *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 10 (1st Cir.2004). We will thus only consider the defendants' argument if an error was committed, that error was obvious as well as prejudicial, and "review is needed to prevent a miscarriage of justice." *Smith v. Kmart Corp.*, 177 F.3d 19, 26 (1st Cir. 1999). The district judge made no error in his instructions, much less plain error.

### 1. *Instructions on Retaliation Claims*

▮ Leary argues that the jury should have been instructed that his TRO against Dixon could not have been retaliatory as long as it was not baseless, even if he sought it for retaliatory purposes. The First Amendment protects an individual's right to petition the courts, but that right is not absolute. *See Sahli v. Bull HN Info. Sys.*, 437 Mass. 696, 774 N.E.2d 1085, 1090 (2002). For example, in the labor and antitrust contexts, "sham" suits can lead to civil liability if those suits "were both objectively baseless *and* subjectively motivated by an unlawful purpose." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (citing *Bill Johnson's Rests., Inc., v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) and *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)).[8] The Massachusetts Supreme Judicial Court has held that sections 4(4) and 4(4A) do not reach employers' lawsuits *if* those suits have "a legitimate basis in law and fact" and there is no "evidence that the employer's purpose is other than to stop conduct it reasonably believes" to be contrary to law. *Sahli*, 774

N.E.2d at 1092. Further, it is not unusual for courts to consider the retaliatory nature of lawsuits in the context of Title VII. *See, e.g., Berry v. Stevinson Chevrolet*, 74 F.3d 980, 987 (10th Cir.1996) (upholding determination that defendants' baseless suit was retaliatory); *Roberson v. Snow*, 404 F.Supp.2d 79, 95 (D.D.C.2005) (finding that plaintiff failed to produce sufficient evidence that defendant's pressing of criminal charges was retaliatory).

▮ Against these background principles, there was no error in the instructions. The judge instructed the jury: "[Dixon] claims that Mr. Leary, not—remember, he's got a right to go to court on the truth. She claims he went to court to interfere with her ability to be a police officer.... She claims that was untrue on Mr. Leary's part and that it was designed to retaliate, to interfere with her working as a police officer." The general guidance of the instruction was clear and correct; we do not require magic words. *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 378 (1st Cir.2004) ("It is the district court's prerogative to craft the 'particular verbiage' that it will use in its jury instructions."). The jury was asked to decide whether Leary's reason for going to court was "true," which in the case of a TRO is equivalent to evaluating the objective reasonableness of his claimed fear. It was also asked whether Leary was acting with a retaliatory intent. This was enough.

### 2. *Instructions on Punitive Damages*

The Local, the IBPO, and Leary also argue that the punitive damages instructions were incorrect. Again, these objec-

---

**8.** As for non-baseless suits, the Court in *BE & K Construction* reserved the question of whether the NLRB could declare unlawful "any unsuccessful but reasonably based suits that would not have been filed *but for* a mo-

tive to impose the costs of the litigation process, regardless of the outcome, in retaliation for NLRA protected activity." 536 U.S. at 536–37, 122 S.Ct. 2390 (emphasis added).

tions to instructions were not preserved at trial, and there was no error.

 Because the jury verdict form did not differentiate between the state and federal claims, and because the claim must be sustainable under the state statute in order for the entire jury award to be upheld, we analyze the jury verdict on the retaliation and discrimination claims under state law. When "state law provides the basis of decision, 'the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.'" *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 306 (1st Cir. 1998) (quoting *Browning–Ferris Indus. of Vt. v. Kelco Disposal*, 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)).[9] Under Massachusetts law, punitive damages are appropriate "where a defendant's conduct warrants condemnation and deterrence." *Bain*, 678 N.E.2d at 161–62; *see also Dartt*, 691 N.E.2d at 537 ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." (quoting *Restatement (Second) of Torts* § 908(2) (1979)) (internal quotation marks omitted)); *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 28 (1st Cir.2003) (quoting *Bain* and *Dartt* in setting out the Massachusetts standard for punitive damages under the state antidiscrimination statute).

The judge repeatedly emphasized in his instructions that punitive damages should be awarded only when the defendants' conduct was especially outrageous: "Punitive damages are reserved for egregious, that is, especially bad violations of civil rights.

And they are designed . . . as a punishment." "But I emphasize to you, punitive damages are to be reserved for the especially bad, the egregious violations of civil rights." "You would have to find the retaliation was extreme, egregious, and if you do, then as a fine you may impose [punitive damages]." The instructions were appropriate.

## III. *PLAINTIFF'S APPEAL*

Dixon appeals the district court judge's application of the actual malice standard to her defamation claim. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). She argues both procedural and substantive errors. As for the procedural errors, she argues that the second judge assigned to the case erroneously assumed the first judge had decided to apply the actual malice standard; she also argues that when the second judge, in his preliminary jury instructions, suggested that the actual malice standard would *not* apply, he set the law of the case, which she relied upon to her detriment. As to the substantive error, she argues that the actual malice standard should not have been applied because Lyons's comments did not pertain to her official conduct as a public official and because she was not a limited-purpose public figure. We turn first to the substantive question.

 The actual malice standard is appropriate when the subject of the alleged defamation is a public official or a public figure. *Gertz v. Welch*, 418 U.S. 323, 342–43, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Whether Dixon is a public official or public figure is a question of law that

---

**9.** In any event, the instructions were also entirely consistent with federal law, which allows punitive damages under Title VII if the employer acted with "malice or reckless indif-

ference to federally protected rights." *McDonough*, 452 F.3d at 23 (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).

we review de novo. *Pendleton v. City of Haverhill,* 156 F.3d 57, 68 (1st Cir.1998) (public figure determination); *Kassel v. Gannett Co.,* 875 F.2d 935, 937 (1st Cir. 1989) (public official determination). If Dixon is instead a private figure, then under Massachusetts law she need only prove negligence. *Mandel v. Boston Phoenix, Inc.,* 456 F.3d 198, 201–02 (1st Cir.2006); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 168 (1975).

■ Dixon concedes that, under Massachusetts law at least, police officers are public officials for defamation purposes. *Rotkiewicz v. Sadowsky,* 431 Mass. 748, 730 N.E.2d 282, 287 (2000); *see also id.* at 288 n. 5 (collecting cases from other jurisdictions treating police officers as public officials). Dixon argues, however, that Lyons's comments on his television show did not pertain to her conduct as an official.

■ It is true that the actual malice standard only applies to comments "relating to ... official conduct," *New York Times Co.,* 376 U.S. at 279–80, 84 S.Ct. 710, but that limitation has been broadly construed to reach "anything which might touch on ... [the] official's fitness for office," *Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). So many things can "touch on" someone's "fitness for office" that this restriction to the actual malice standard is very rarely applied. *Buendorf v. Nat'l Pub. Radio, Inc.,* 822 F.Supp. 6, 12 (D.D.C.1993) ("The Supreme Court and lower courts have construed the rule of *New York Times Co. v. Sullivan* to include almost any comment regarding a public official."); *see also, e.g., Soke v. Plain Dealer,* 69 Ohio St.3d 395, 632 N.E.2d 1282, 1284 (1994) (whether off-duty police officer lied under oath related to his fitness for office); *Roche v. Egan,* 433 A.2d 757, 758, 762–64 (Me.1981) (letter

alleging off-duty police officer had "violent temper, threatened little children, [and] kicked pets" related to his fitness for office). Further, the actual malice standard "is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed." *Garrison,* 379 U.S. at 77, 85 S.Ct. 209.

■ On his television show, Lyons repeatedly made comments which effectively called Dixon a drunk, a liar, and a promiscuous woman. Whether she lied to the police department's internal investigators and to the Civil Service Commission does relate to her official conduct, as she participated in the investigation as a Lowell police officer. Indeed, the police department contemplated disciplining Dixon for perjury the same summer she left the force. While the other two accusations pertain mostly to her conduct the night of the bus incident, Dixon was participating in the events that evening as a representative of the police union, leveraging her public stature as a police officer to support the union's gubernatorial candidate. *Cf. Smith v. Huntsville Times Co.,* 888 So.2d 492, 498 (Ala.2004) (declining to treat police officer as truly off duty where he had repeatedly invoked his role and power as a police officer in interactions with his neighbors). Even if we were to consider Dixon completely "off duty" that evening, the Lowell police department considers public drunkenness to be related to its officers' fitness for duty, as evidenced by its disciplining of the male officers for their excessive alcohol consumption that evening.

While we are more skeptical of the relevance of comments about Dixon's alleged sexual conduct, there is no basis for separating out a few scattered allusions that might have crossed the divide between public and private. Dixon did not confine her suit to comments about her private sexual conduct. It is enough that the vast

majority of the commentary pertained to official police investigations and actions that could bear on an officer's qualifications for holding a position of public trust. *See Restatement (Second) of Torts* § 580B cmt. a (actual malice standard does not apply to a public official "if he is defamed *only* in regard to a purely private matter, not affecting his conduct, fitness or role in his public capacity") (emphasis added); *cf. Roche*, 433 A.2d at 763 (finding that letter related to officer's fitness for office based on one of its allegations, even if the rest could be considered purely personal).

As for Dixon's procedural arguments, the record shows that the second judge made an independent ruling that the actual malice standard would apply, after plaintiff clarified that the first judge had not firmly decided the issue. Dixon also argues that she was prejudiced by inconsistent rulings over the course of the trial on what standard would apply. We see no inconsistency, merely a misstatement on which Dixon could not have reasonably relied. The first judge assigned to the case allowed the parties to brief the actual malice issue, but only after noting that "a police officer is an official position." The second judge told the parties before trial that Dixon would have to prove actual malice.

In giving the jury its preliminary instructions, the second judge did comment in passing that "there's no claim that Ms. Dixon's a public officer." While the slip was unfortunate, it was not significant. Given the judge's earlier clear statement to the parties, this misstatement could not have set the law of the case. *See generally United States v. Moran*, 393 F.3d 1, 7 (1st Cir.2004) (discussing law of the case doctrine). Further, any reasonably prudent plaintiff would have put forward a case proving actual malice, for at best the issue had not been resolved definitively in Dixon's favor; indeed, Dixon does not

mention what additional evidence she would have presented had she known that the actual malice standard would apply. *See Gertz*, 418 U.S. at 329 n. 2, 94 S.Ct. 2997 ("It is clear that the trial court gave petitioner no reason to assume that the *New York Times* privilege would not be available to [defendants].... [Plaintiff] had every opportunity, indeed incentive, to prove [actual malice] if he could....").

## IV. CONCLUSION

Dixon presented sufficient evidence to establish her retaliation and discrimination claims against Leary and the unions. The judge correctly instructed the jury on retaliatory motive and punitive damages. He also correctly applied the actual malice standard to Dixon's defamation claim. We affirm. Each side is to bear its own costs.